# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT NASHVILLE
## August 10, 2022 Session

## STATE OF TENNESSEE v. MICHAEL LEE ARTHUR MORENO

**Appeal from the Criminal Court for Davidson County**
**No. 2016-D-2183    Cheryl A. Blackburn, Judge**

_____

### No. M2020-01090-CCA-R3-CD

_____

The Defendant, Michael Lee Arthur Moreno, was convicted by a Davidson County Criminal Court jury of attempted voluntary manslaughter, a Class D felony; reckless endangerment, a Class A misdemeanor; and employing a firearm during the commission of a dangerous felony, a Class C felony, and was sentenced by the trial court to an effective term of eight years in the Department of Correction. He raises the following three issues on appeal: (1) whether the evidence is sufficient to sustain his convictions; (2) whether the trial court abused its discretion under Tennessee Rule of Evidence 404 and Tennessee Code Annotated section 24-7-125 by restricting cross-examination of one of the victims about text messages the victim sent the night before the shooting expressing the victim's desire to commit a robbery; and (3) whether the trial court erred under Tennessee Rule of Evidence 613 by allowing the State to introduce rebuttal evidence of a defense witness's recorded statement to police. Based on our review, we conclude that the evidence is sufficient to sustain the convictions, that the trial court did not err in restricting cross-examination of the victim, and that the Defendant, who failed to raise a contemporaneous objection at trial, cannot show plain error in the introduction of the defense witness's statement. Accordingly, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR. and JILL BARTEE AYERS, JJ., joined.

Manuel B. Russ, Nashville, Tennessee (on appeal), and Sais Phillips Finney, Courtney Teasley, and John Morris, Memphis, Tennessee (at trial), for the appellant, Michael Lee Arthur Moreno.

Herbert H. Slatery III, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Glenn R. Nash, District Attorney General; and Doug Thurman and Bryon Pugh, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case arises out of the Defendant's shooting and seriously injuring two men in a parking lot near a Nashville Taco Bell restaurant. On July 25, 2016, Adriana Fuentes, a woman with whom the Defendant had been romantically involved, enlisted the aid of a new boyfriend, Gregory Bailey, in an attempt to extort money from the Defendant. Ms. Fuentes' scheme involved having Mr. Bailey pretend that he was holding her against her will, beating and raping her, and threatening her further physical harm because of a debt she allegedly owed him. In furtherance of that scheme, Ms. Fuentes first had Mr. Bailey come to a McDonald's restaurant where Mr. Bailey, feigning anger in front of the Defendant, ordered Ms. Fuentes into his vehicle and then drove off with her in his car. Later that same day, Ms. Fuentes repeatedly texted the Defendant to tell him that she was being raped and beaten and to ask him to meet her and Mr. Bailey with cash in order to secure her release. At approximately 11:00 that same night, Mr. Bailey, Ms. Fuentes, and Mr. Bailey's friend and co-worker, Eaven Rankens, arrived at the meeting location, saw the Defendant parked nearby, and pulled in beside the Defendant. Within seconds, the Defendant fired five shotgun rounds into Mr. Bailey's vehicle, striking and injuring all three occupants. The Defendant took Ms. Fuentes to the hospital after the shooting and was arrested early the next morning following a traffic stop on Interstate 65.

On November 7, 2016, the Davidson County Grand Jury returned a four-count indictment that charged the Defendant in count one with the attempted first degree premeditated murder resulting in serious bodily injury of Mr. Bailey, in count two with the attempted first degree premeditated murder resulting in serious bodily injury of Mr. Rankins, in count three with employing a firearm during the commission or attempt to commit the dangerous felony referenced in count one, and in count four with employing a firearm during the commission of or attempt to commit the dangerous felony referenced in count two. The Defendant was also apparently charged in a second indictment with reckless endangerment with a deadly weapon, but the charge was later nolle prosequied. The judgment for that count is included in the record on appeal, and lists the count as count three. The indictment for that count is not included in the record.

**State's Proof**

At trial, Gregory Bailey testified that on the afternoon of July 25, 2016, he picked up Mr. Rankins and went to a music studio in Antioch, where the two men "h[u]ng out" writing, recording, playing and listening to music. At some point, he received a phone call from Ms. Fuentes, whom he had been dating casually for approximately one month. Ms. Fuentes told him that she was at the McDonald's at the intersection of Nolensville and Bell Roads (the Nolensville Road McDonald's), that some man was "messing with her[,]" and that she needed Mr. Bailey to come get her. Mr. Bailey stated that Ms. Fuentes instructed him to "act . . . mean and tough and hard and tell her that . . . she owed [him] money[.]" Ms. Fuentes also instructed him to tell the man that Ms. Fuentes would be leaving the restaurant with Mr. Bailey.

Mr. Bailey testified that he followed Ms. Fuentes' instructions. Leaving Mr. Rankins behind at the music studio, he arrived at the Nolensville Road McDonald's at approximately 5:00 p.m. to find Ms. Fuentes walking out of the restaurant followed by a man that he did not know, but whom he later learned was the Defendant. According to Mr. Bailey, he walked up to Ms. Fuentes and, acting angry, repeatedly ordered her to get into his car. He then aggressively asked the Defendant, "[H]ey, do you got a problem?" The Defendant did not reply, and Mr. Bailey got into his vehicle with Ms. Fuentes and left. Mr. Bailey testified that he was unaware of Ms. Fuentes' romantic relationship with the Defendant. Ms. Fuentes told him only that the Defendant was a man "she use[d] to get some money out of sometimes[.]"

Mr. Bailey testified that he took Ms. Fuentes with him to the music studio, where he continued to hang out with Mr. Rankins and others for the next few hours. He did not pay attention to what Ms. Fuentes was doing during that time. The studio eventually closed and he, Mr. Rankins, and Ms. Fuentes left together in his vehicle. As they were leaving, Ms. Fuentes told him that she had to get some money out of the Defendant. Ms. Fuentes then called the Defendant and said, "[H]ey, they're gonna hurt me, they are gonna do this if you don't give me the money[.]" When she hung up, he asked her what it was about. She then called the Defendant back, handed the phone to Mr. Bailey, and had him tell the Defendant to give Ms. Fuentes the money. Mr. Bailey stated that he did not know at that time of the other conversations that Ms. Fuentes had had with the Defendant that afternoon and evening. He knew only that Ms. Fuentes was in the habit of using the Defendant to get money, so when she handed him the telephone, he went along with her scheme:

> [A]nd so later on when she told me that, hey, I think I can just get some money out of him, you know what I'm saying, well, you know, like use him. I just use him for my phone bills, use him to do this. I think I can get some money out of him, so when she did that after she told me, you know

what I'm saying, she was just like here just, you know, tell him, so she just handed me the phone like, like in the car, I was driving I believe on the way and she handed the phone and she was like just tell him.

I was like just like give her the money, give her the money, give her the money and then she got on there and then later on is when I found out all of the extra stuff that was said and had gone on.

Mr. Bailey testified that he never saw Ms. Fuentes' text messages and never heard her tell the Defendant that she had a "busted lip" or that she was hurt. All he heard her say was that they were going to hurt her if she did not get the money. He did not even know to whom she was talking until she told him that it was the man from the Nolensville Road McDonald's. It was not until later that he learned that she had told the Defendant that he and Mr. Rankins had kidnapped and beaten her. Mr. Bailey denied that he or Mr. Rankins struck Ms. Fuentes, kidnapped her, or threatened to hurt her. He said that none of them had a gun that night and that he never told the Defendant that he had a weapon.

Mr. Bailey testified that Ms. Fuentes directed him to the McDonald's on Bell Road near Interstate 24 ("the Bell Road McDonald's), telling him that she had arranged to meet the Defendant there. He drove to that location and parked his vehicle and the three of them waited for approximately twenty or thirty minutes, but the Defendant did not show up. During the time that they waited, Ms. Fuentes and Mr. Rankins were standing outside his vehicle "on the phone" and "smoking cigarettes[.]" He finally asked Ms. Fuentes if they could leave, and she told him that they were at the wrong McDonald's and needed to go to the one on Nolensville Road instead. She and Mr. Rankins then got back in his vehicle, with Ms. Fuentes occupying the backseat and Mr. Rankins as his front seat passenger.

Mr. Bailey testified that he missed the entrance to the Nolensville Road McDonald's and turned into the next entrance that led to Taco Bell. As he did so, Ms. Fuentes said, "[T]here he goes right there," referring to the Defendant's white SUV. By the time he turned his vehicle around, the Defendant had his SUV backed into a parking space. He pulled up beside the Defendant and then turned to ask Ms. Fuentes, "[I]s that him[?]" When he turned back around, the Defendant was outside his vehicle with a shotgun and "just started shooting." Mr. Bailey testified that the Defendant was wearing gloves and said nothing before opening fire:

No. No one said, I mean, literally we pulled in like pulled right in. I had enough time to look back and say is that him and by the time I turned around he already had a gun and I said he's got a gun and then he just started shooting, so I mean it happened within like 30 seconds or 20 seconds of us being there, so I mean, I don't even know if I put the car all the way in park,

- 4 -

you know what I'm saying.  I don't even remember.  I mean, it was just so fast when I got there, because I didn't pull all the way into the parking lot.

Mr. Bailey testified that the Defendant fired five shots.  He said the gunshots blew his finger off, struck him in the arm and chest, and struck both Mr. Rankins and Ms. Fuentes.  The Defendant first shot at him through the windshield but then moved to the other side of his vehicle to shoot through the passenger side window:

Well, I mean, the first thing I did was put up my hand like that and it blew my finger off and then it hit me in my chest and it hit her and [Mr. Rankins], so [Mr. Rankins] had to jump out through the side of the car on the passenger side where he was sitting at and he shot through the front and then walked around to the other side and then started shooting through my passenger's side window, so I had to try to crawl out through the other side and that is when I got hit two or three more times in my arm and my chest.

Upon further direct examination, Mr. Bailey corrected that it was the driver's side window that the Defendant shot through.  He said that by the time he made it out of the vehicle through the front passenger door, neither Mr. Rankins nor Ms. Fuentes were in sight.  He stated that he attempted to flag down passing motorists for help, but no one would stop.  He also attempted to enter the Taco Bell restaurant, but the doors were locked and he was unable to get inside.

Mr. Bailey testified that in addition to having a finger blown off, his pinky and middle finger were broken, and he was struck in both the arm and chest, with approximately 1500 to 2500 pellets still remaining in his body.  He stated that he was bleeding profusely from the chest and that his pain level was ten on a scale of one to ten.  He had pins inserted in his broken fingers and reconstructive surgery to close the wound on his chest using half of a muscle from his back.  He stated that he spent a total of five months hospitalized, with three days in the first hospital before being transferred to two other hospitals.  He later clarified that he was incarcerated on a parole violation and that his later hospitalization was at a prison special needs facility.

Mr. Bailey testified that he was twice interviewed about the shooting.  In the first interview at the hospital, he did not say anything about the extortion scheme because he was on parole and did not want to get either himself or Ms. Fuentes in trouble.  In his second interview that took place at the district attorney's office, the prosecutor granted him use immunity and he gave a statement that was consistent with his trial testimony.  He identified various photographs of the crime scene that were subsequently admitted as exhibits, including ones that showed a shotgun hole to the windshield of his white Chevrolet Malibu and four shotgun holes to his driver's side window.

On cross-examination, Mr. Bailey acknowledged that he had a conviction for reckless endangerment, a conviction for evading arrest, and two convictions for possession with intent to sell. He further acknowledged that he failed to mention the extortion scheme in not just one, but two separate interviews with the police in July 2016, before he finally revealed it in his August 2018 interview with the prosecutor. Defense counsel then attempted to question him about texts he had sent the night before the shooting about his desire to commit a robbery. The State objected, and a lengthy bench conference followed that culminated the following morning with the trial court's prohibiting any mention of Mr. Bailey's desire to commit a robbery or of needing to "hit a lick."

When cross-examination resumed, Mr. Bailey acknowledged that, the day before the shooting, something had happened that placed him in danger of losing his home. He could not recall having texted someone named "Black" the night before the shooting about his immediate need for money. He acknowledged that he texted Ms. Fuentes that night about his need for money, that she texted back that he was "not clutching," meaning that he had no gun, and that he replied that "my people do." Ms. Fuentes then texted back that he was moving too fast. The next day, she texted him about needing him to come get her from the Nolensville Road McDonald's. In the texts that followed, she instructed him to act like a "big homie" and to act as if he had a gun.

Mr. Bailey acknowledged that he texted Ms. Fuentes to ask who the Defendant was. He explained that he needed to know whether the Defendant was armed and whether he had anyone with him. He agreed that he then sent Ms. Fuentes a text stating, "we can get this money together Boo[.]" He stated that his text about getting the money together had nothing to do with the Defendant. He acknowledged, however, that Ms. Fuentes referred to the Defendant in one of the texts as "nothing but money walking." He further acknowledged that, immediately after he had picked up Ms. Fuentes from the Nolensville Road McDonald's, he sent a text to Mr. Rankins stating "I almost smacked this b**ch n*****, he ain't do sh**[.]"

Eaven Rankins' direct examination testimony was consistent with Mr. Bailey's with respect to the phone call Mr. Bailey received from Ms. Fuentes, Mr. Bailey's having left the studio and returned with Ms. Fuentes, and the three of them leaving the studio together in Mr. Bailey's vehicle at approximately 10:30 p.m. He testified that when they left the studio, he thought that Mr. Bailey and Ms. Fuentes were planning to drop him off at his home. However, their first stop was at the Bell Road McDonald's because, from his understanding, Ms. Fuentes was supposed to meet a man to get some cash. He said he was unable to hear any conversation between Ms. Fuentes and Mr. Bailey during the drive to the Bell Road McDonald's. When they reached the restaurant, he got out of the vehicle to take a phone call while Mr. Bailey and Ms. Fuentes remained together inside the vehicle.

Ms. Fuentes was on her phone when he got back inside the vehicle, but he was unable to hear her conversation.

Mr. Rankins testified that Ms. Fuentes rode in the front passenger seat during the drive to the Bell Road McDonald's, but when they left, Ms. Fuentes suggested that he switch seats with her. He said they were supposed to turn into the Nolensville Road McDonald's, but Mr. Bailey turned instead into the Lowe's parking lot beside the Taco Bell. He testified that he did not have a gun on him and, to his knowledge, neither Mr. Bailey nor Ms. Fuentes had a gun. Further, he did not hear any conversation in the vehicle about a gun.

Mr. Rankins testified that the Defendant had his white Ford Excursion backed into a parking spot, and Mr. Bailey pulled in beside it. The Defendant was standing outside his driver's door and, almost instantly, "shots fired and that was pretty much it." Mr. Rankins stated that the Defendant fired five shots in rapid succession. He said the first shot struck him in the chest and that he reacted by grabbing his chest, looking down to see that he had been shot, opening the car door, and rolling out of the vehicle. The Defendant fired the second shot, which struck him in the side and buttocks, as he was rolling out of the car, and the Defendant continued to fire after he had exited the vehicle and was crouched behind it.

Mr. Rankins testified that he ran to the Taco Bell drive-through lane, "bobbing and weaving through the cars," and at that point saw the Defendant's vehicle "pull off and go down the street." Bleeding heavily, he "bang[ed] on" the restaurant window and tried to pull the door open but was unable to do so. As he was on the verge of losing consciousness, police officers arrived to help him. He testified that his pain level was ten on a scale of one to ten, that he had a total of 27 bullet fragments in him after the shooting and that nineteen still remained, and that he continued to experience discomfort from the bullet fragments that remained in his body.

On cross-examination, Mr. Rankins testified that he had no idea beforehand about Ms. Fuentes' plans to meet the Defendant to get money from him. He said that Mr. Bailey and Ms. Fuentes told him only that they were stopping at a McDonald's. Ms. Fuentes did not mention meeting the Defendant until they were arriving at the second McDonald's. He denied having stated otherwise in an interview with a police detective. He stated that he found nothing odd about Ms. Fuentes' request to switch seats with him before they left the Bell Road McDonald's, and he denied that she was lying down or otherwise attempting to conceal herself as they pulled in beside the Defendant.

Officer Daniel Garrett of the Metro Nashville Police Department ("MNPD"), the first officer at the shooting scene, testified that he arrived to find Mr. Bailey at the entrance of the Lowe's parking lot. Mr. Bailey, who appeared terrified and was screaming for help,

walked toward him, and Officer Garrett could see a "large amount of blood" coming from his face and his "extremely mangled" hand, which he held cradled against his chest. He recalled that Mr. Bailey was wearing a white "wife beater" undershirt, and that shotgun pellets were visible in the skin of his forehead. He identified photographs of Mr. Bailey's white Malibu showing the shotgun blasts to the windshield and driver's window and shotgun casings on the ground outside the vehicle.

MNPD Officer Megan Arnett testified that she arrived at the shooting scene to find Mr. Rankins "hunched over" on the curb near the Taco Bell. Mr. Rankins was "very frantic and worried," repeatedly stating that he was going to die, and when she opened his shirt she saw multiple buckshot wounds in his chest. On cross-examination, she testified that she assumed the shotgun pattern wounds she observed in Mr. Rankins' chest came from buckshot, but she was not certain.

MNPD Sergeant Christopher Turner testified that he was given a description of the suspect's vehicle and the Defendant's name as the possible suspect. After verifying that the Defendant owned a Ford Excursion and lived in Hendersonville, he notified the Hendersonville Police Department, which located the vehicle at the Defendant's address. The Hendersonville Police Department later notified him of the Defendant's departure from his residence, and he coordinated with the Madison Police Department in the Defendant's subsequent arrest.

MNPD Officer Michael Mendenhall testified that early on the morning of July 26, 2016, he and a number of other officers responded to the area of Interstate 65 where the Defendant was traveling, conducted a "felony stop," and arrested the Defendant. He identified photographs of the Defendant's vehicle and the items found inside it, which included a guitar case on the backseat that contained a 12 gauge shotgun with a spent shell in the chamber. On cross-examination, he acknowledged that the Defendant was "very cooperative[.]"

Investigator John Terry, a civilian employee of the MNPD and the crime scene investigator who responded to both the shooting scene and the scene of the Defendant's arrest, identified photographs he took of various items collected into evidence. At the shooting scene, he found four spent Remington shotgun shells and a live Remington shell on the ground beside the vehicle's driver's door. Inside the Defendant's vehicle, he found a guitar case containing a 12 gauge Mossberg shotgun with a spent shell inside it, a box of Remington shotgun shells, and a partial box of Winchester shotgun shells. He also found blood on the upright portion of the Defendant's front passenger seat. On cross-examination, he testified that the shotgun was a "bullpup configuration[,]" which is "basically an aftermarket covering . . . that some people chose to put on their shotgun for a variety of reasons."

MNPD Officer Joe Shelton, a firearms expert, testified that the shotgun involved in the case was a 12 gauge, pump action with a bullpup, or "aftermarket stock" that "makes the shotgun shorter and more concealable in the total length." He stated that once the trigger is pulled, the shotgun has to be physically pumped to eject the shell casing and to feed another shell so that the shotgun can be fired again. He agreed that one theory to explain the live round found at the shooting scene would be "if the person didn't know that there was a live round already in the barrel and he pumped it first[.]" In his experience, such a shotgun was not typically used for hunting but was instead consistent with home defense.

He testified that the shotgun shells found at the scene were consistent with those found in the Defendant's vehicle: one ounce, six shot, which, he said, is the type typically used for hunting small game. After a lengthy explanation about the dispersal pattern of shotgun pellets and how a one ounce, six shot shell with approximately 225 pellets per shell can act as a single projectile or "shotgun slug" at closer distances, he testified that, based on the defects in the victim's vehicle and the location of the ejected shells, the individual who fired the shots was standing an estimated six to seven feet from the vehicle. He stated that even though the shotgun shells were intended for small game, "it still is extremely lethal at that distance[,] and he agreed that the shotgun and ammunition involved in the case "was a lethal firearm with lethal ammunition."

On cross-examination, he acknowledged the possibility that the shotgun was not modified after purchase, as Mossberg formerly manufactured and sold a shotgun with a bullpup configuration. He said that number six shot "is typically used for small game animals such as rabbits, squirrels, doves, pheasants things of that nature." He agreed that all the rounds recovered from the scene were the same size as the ammunition found in the Defendant's vehicle: "12 gauge, 6 shot, 1290."

MNPD Detective Chad Gish of the Surveillance and Investigative Support Unit ("SISU"), an expert in digital forensics, testified that he was asked to extract data from three different cell phones in the case, including the Defendant's. He identified his report containing some of the text messages recovered from the Defendant's phone, which was admitted as an exhibit. He also read aloud from the texts exchanged between the Defendant and Ms. Fuentes beginning at 3:01 a.m. on July 25. The texts began with an exchange of affectionate trivial messages, then switched to the Defendant accusing Ms. Fuentes of being "high" and not wanting to be with him anymore, and Ms. Fuentes responding with "F*** ya bye." After more text messages in which each insulted the other, the Defendant texted, "Now you don't want to answer? Who are you with? What f***in n**** are you with that you don't want to answer the phone?" followed by the Defendant's text, "You think I'm stupid frfr I'm blowing you the f*** up. What are you gonna say now, Your phone died? Yea, bull s***."\

At 4:30 p.m., Ms. Fuentes texted the Defendant asking if he could give her $60, which she later followed with a text with nothing but question marks. Starting at 8:44 p.m., Ms. Fuentes sent a series of texts to the Defendant pleading with him to save her from being raped and beaten and asking him for money. In these multiple texts, Ms. Fuentes told the Defendant that her assailant would let her go if the Defendant gave him three to five hundred dollars, that she did not want to "get raped or hit any more," that she had a black eye and a "busted" lip, and that her assailant was "strapped."

The Defendant texted back "Where you at?" and Ms. Fuentes responded with more pleading texts for the Defendant to save her, along with the information that her assailant was now demanding at least $500. At 10:33 p.m. the Defendant sent a message to Ms. Fuentes that read: "I'm trying to meet up with them" and for Ms. Fuentes to tell the men to please answer. The final text message was sent from Ms. Fuentes to the Defendant and stated only, "On my daughter's life, Michael."

At 1:01 a.m. on July 26, Ms. Fuentes' brother texted the Defendant to let him know that Ms. Fuentes was in the hospital. The Defendant expressed surprise, and several texts between the two men followed in which they discussed Ms. Fuentes' health status and her having become involved with a bad crowd.

On cross-examination, Detective Gish testified that the Defendant's text to Ms. Fuentes that stated, "I'm blowing you up, I'm blowing you TF up" meant that he was calling her phone over and over again. He said that Ms. Fuentes' text that her assailant "was strapped" meant that he had a gun. He testified that three phones were submitted to him for analysis but data was retrieved from only two phones. He recalled that the phone that belonged to Ms. Fuentes was passcode protected and that neither passcode she provided worked.

MNPD Detective Frederick Heiman, the lead detective in the case, testified that he responded first to the Southern Hills Hospital, where he spoke with Ms. Fuentes, who had a gunshot injury to her back. He said he did not observe any injuries to Ms. Fuentes' face. He went next to the shooting scene, where no weapons were found, either in Mr. Bailey's vehicle or at the scene. He then prepared a photographic lineup with a photograph of the Defendant, who had been developed as a suspect, and went to Vanderbilt Hospital, where he showed the photographic lineup to Mr. Rankins and Mr. Bailey. Neither man was able to make an identification. He then returned to the police station, where the Defendant, having waived his *Miranda* rights, gave a recorded statement at 3:30 a.m. on July 26, 2016 in which he admitted his involvement in the shooting.

The videotaped statement was published to the jury and admitted as an exhibit, along with a transcription of the videotape. In the statement, the Defendant told of the

afternoon confrontation with Mr. Bailey at the Nolensville Road McDonald's, the pleading texts and calls he later received from Ms. Fuentes in which she claimed that she was being raped and beaten and asked for his help, and his telephone conversations with Mr. Bailey in which Mr. Bailey told him that he had a gun. The Defendant stated that he did not have any money but arranged to meet Mr. Bailey anyway. He said he did not know whether Ms. Fuentes was telling him the truth or if she was "playing" him. He stated that he told Mr. Bailey that he was waiting on the other side of the Nolensville Road McDonald's, but instead he was waiting from a position near the Taco Bell. He said he was on the phone with Mr. Bailey as Mr. Bailey pulled up to the meeting location, and he overheard Mr. Bailey ask someone in the vehicle if he had "the strap ready." He stated that in earlier conversations, Mr. Bailey had told him that he was going to shoot him.

The Defendant testified that, although he did not know Mr. Bailey by name, he knew of him and had heard that he was friends with ex-gang members. He said that he feared he was being set up and was going to get "whacked." At the same time, he was unsure if Ms. Fuentes might possibly be telling him the truth and he did not want her to get raped or hurt. He said Mr. Bailey's vehicle had tinted windows and all that he could see when Mr. Bailey pulled up was that there was a man inside the vehicle. He stated that he was angry, and that he exited his vehicle and started toward Mr. Bailey's vehicle. He said that Mr. Bailey got out of the vehicle, and that he then began shooting:

> So fast forward to tonight. He comes out, I mean they park, see them as soon as he parks, as soon as he parks, as soon as he parks, I was just pissed off. So . . . uh. . . Soon as he parks, I'm thinking maybe I should go up there and talk to him. Supposedly, he's got a gun. Do I know if he has it? I don't know. Did she tell me he had a gun? She did. Did he tell me he had a gun? He did. When he called me, the very last phone call, he said "you got the paper?" And I said "yeah, I, I have the money." And he said "alright." He's saying to somebody "you got the strap? You got the strap ready?" I don't know. So when he gets out, I mean - - nope - - as soon as the car parks, I get out, and I go towards them. I go towards them.
>
> . . . .
>
> He gets out, I go up, I go up, uh, . . . I go up . . . and try and shoot him. I got the safety on. Can't take the safety off. Didn't even know. Didn't even know . . . what the hell was going on. Finally got the safety off . . . and I shoot. Shoot at the window. Probably . . . probably about three or four shots.

When asked what was going through his mind just before he pulled the trigger, the Defendant indicated he had mixed emotions of anger, a desire to hurt Mr. Bailey and to

rescue Ms. Fuentes, and an uneasy feeling that he might have just been set up by Ms. Fuentes:

> Good question. I just . . . honestly, honestly, I wanted to hurt, I wanted to hurt, I wanted to hurt him, and I wasn't taking no chance. I wanted to rescue her, but at the same time, she supposedly got kicked out of her house and stuff. She's staying somewhere, some friend's I don't, I don't know. From the beginning, it just, everything felt wrong. Not because, not because, yeah shooting somebody . . . is a wrong thing. Yeah I'm not lie I've never done it before. And now I'm here. And now I met you uh in an unpleasant way. But I wanted, I wanted to help her. And in the back of my mind, something, something just didn't feel right. I wasn't sure if maybe I was going to give him three hundred or five hundred dollars, and then supposedly he's gonna let her go and drop her off and then, they're friends. I don't know.

Detective Heiman testified that if the Defendant had contacted the police about the information in Ms. Fuentes' text messages, officers would have been dispatched to check on her welfare. He said the Defendant never mentioned having made any attempt to contact the police or of having been threatened not to contact the police. He stated that the Defendant's claim that Mr. Bailey exited the white Malibu before the Defendant fired was not consistent with evidence found at the crime scene.

On cross-examination, Detective Heiman acknowledged that he told Ms. Fuentes in an interview that the whole situation could have been avoided if Ms. Fuentes had not "done this[,]" by which he meant attempt to extort money from the Defendant by manufacturing a story about being raped and abducted. He testified that when he interviewed the three shooting victims in their respective hospital rooms, none mentioned anything about the extortion scheme, the earlier confrontation between the Defendant and Mr. Bailey, or of knowing the Defendant.

Mr. David Zoccola, a criminal investigator with the Davidson County District Attorney's Office, testified that he attempted from May through September 2018 to locate Ms. Fuentes but was unsuccessful. On October 1, 2018, he learned that she had been taken into custody, but he never spoke with her.

### Defendant's Proof

MNPD SISU Detective Anthony Heil, an expert in digital forensics, testified that he extracted 9,359 text messages from Mr. Bailey's cell phone. He identified his case summary report, which was admitted as an exhibit.

Adriana Fuentes testified that she was twenty-years-old at the time of the shooting and had been in a relationship with the Defendant for approximately one year. She knew the Defendant had a gun, but he had never been violent with her. She stated that she had been in a relationship with Mr. Bailey for a few months before the shooting and that she continued for some time after the shooting to have a relationship with him as a "dope man." When asked if Mr. Bailey texted her the night before the shooting about needing money, she replied, "He text me saying that he wanted to rob somebody." The trial court immediately instructed the jury to disregard the answer, and a short bench conference ensued during which the trial court warned defense counsel to be more careful in her questioning.

Upon continued direct examination, Ms. Fuentes testified that on July 25, 2016, Mr. Bailey and the Defendant had an altercation at the Nolensville Road McDonald's, with Mr. Bailey being "kind of aggressive towards [the Defendant] and towards [her]." She said that Mr. Bailey threatened the Defendant with words and acted as if he were going to hit the Defendant. When she got into Mr. Bailey's car after the confrontation, she saw that Mr. Bailey had a gun under his steering wheel. Later that day, Mr. Bailey spoke on the phone with the Defendant on two or three different occasions. During those conversations, Mr. Bailey threatened the Defendant and told the Defendant that he had a gun and that he was hurting Ms. Fuentes.

Ms. Fuentes testified that, prior to the day of the shooting, she had previously seen Mr. Bailey with guns and had witnessed him threaten people. She said that one of those times was in a video of a bar fight that Mr. Bailey posted on "his [social media] profile[.]" She stated that, prior to July 25, 2016, she had told the Defendant about Mr. Bailey's carrying a gun and threatening and intimidating people. She acknowledged that she did not tell the police the truth in her first two interviews. She testified that Mr. Bailey was her boyfriend at that time, and she agreed that she was trying to protect him. She testified that she overheard Mr. Bailey, while on the phone with the Defendant, say to Mr. Rankins, "get that strap ready[.]" In response to some direct examination questions, she pleaded her Fifth Amendment right to be free of self-incrimination. Finally, she acknowledged that the Defendant took her to the hospital after the shooting.

On cross-examination, Ms. Fuentes denied any memory of the various text messages she sent to Mr. Bailey and to the Defendant on the day of the shooting. She also denied any real memory of the shooting itself, other than of "smoking a blunt" and being "under the influence[.]" She testified that Mr. Bailey did not pull a gun on the Defendant at the Nolensville Road McDonald's, and that neither Mr. Bailey nor Mr. Rankins beat her. She did not remember pulling into the parking lot where she was shot, and she said that she did not see who shot her. She at first said that no one got out of Mr. Bailey's vehicle before the shooting occurred, but upon further questioning, she said that she could not remember.

She stated that she did not remember if Mr. Bailey had a gun at the time of the shooting. When asked if she would be surprised to learn that the Defendant never mentioned Mr. Bailey's name in his interview with the police, she responded that she did not "know how to take it, to be honest." She responded to other questions about her involvement in the extortion scheme and specific texts she sent to Mr. Bailey by pleading her Fifth Amendment right to be free from self-incrimination.

On redirect examination, she testified that she knew Mr. Bailey by his nickname of "Spider," and that was the name she used when talking to the Defendant about him.

The Defendant elected not to testify in his own defense. As his final proof, he introduced text messages extracted from Mr. Rankins' cell phone, which included the text Mr. Bailey had sent to Mr. Rankins after Mr. Bailey's afternoon confrontation with the Defendant at the Nolensville Road McDonald's.

### State's Rebuttal Proof

Detective Heiman testified that he interviewed Ms. Fuentes on August 2, 2016 at the police station. He identified the CD of the videotaped interview, which was played for the jury. He said that the phone number Ms. Fuentes provided in the interview was the same phone number that matched up with the text messages extracted from the Defendant's cell phone. On cross-examination, Detective Heiman acknowledged that he said to Ms. Fuentes at one point in the interview "you do realize this little stunt about the money is what caused you guys to get shot?"

At the conclusion of Detective Heiman's cross-examination, the State moved to have the videotaped interview of Ms. Fuentes admitted as an exhibit under Rule 803.26 of the Tennessee Rules of Evidence, with no objection raised by the defense. The trial court granted the motion and issued an instruction to the jury that it could "consider the statements of Ms. Fuentes in this tape recording as substantive evidence".

Following deliberations, the jury convicted the Defendant of the lesser included offense of attempted voluntary manslaughter in count one, reckless endangerment as a lesser included offense in count two, and employing a firearm during the commission of a dangerous felony in count four.

### ANALYSIS
### I. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to sustain his convictions because there was no proof of his commission of an underlying dangerous felony for the

count of employing a firearm during the commission of a dangerous felony, and the State failed to prove that his shooting of the victims did not occur in self-defense.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *See State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

### A. Employing a Firearm During the Commission of a Dangerous Felony

The Defendant first contends that his conviction for employing a firearm during the commission of a dangerous felony should be dismissed because the State failed to produce sufficient evidence of the "dangerous felony" element of the conviction. Specifically, he asserts that because the indictment linked count four with count two, and he was convicted in count four of employing a firearm during the commission of a dangerous felony but was convicted in count two of reckless endangerment, which is not a predicate felony under the statute, his conviction cannot stand. The State asserts that the record reflects that the Defendant's conviction for employing a firearm during the commission of a dangerous felony was connected to count one, for which the Defendant was convicted of attempted

voluntary manslaughter, which is included as a dangerous felony under Tennessee Code Annotated section 39-17-1324 (i)(1). We agree with the State.

The record contains five judgments: count one, which reflects that the Defendant was charged with attempted premeditated first degree murder resulting in serious bodily injury and was convicted by the jury of voluntary manslaughter; count two, which reflects that the Defendant was charged with attempted premeditated first degree murder resulting in serious bodily injury and was convicted by the jury of reckless endangerment; count three, which reflects that the Defendant was charged with reckless endangerment with a deadly weapon and that the count was nolle prosequied; count four, which reflects that the Defendant was charged and convicted by the jury of employing a firearm during the commission of or attempt to commit a dangerous felony; and count five, which reflects that the Defendant was charged with employing a firearm during the commission of or attempt to commit a dangerous felony, and for which there is no disposition listed. In the comments section of that judgment is the following notation: "not presented because Ct. 2 not a trigger."

In its order overruling the Defendant's motion for new trial, the trial court explained that the count of reckless endangerment with a deadly weapon, originally listed as count three, was nolle prosequied and the verdict forms renumbered when the counts were submitted to the jury for deliberation. The trial court's order reads in pertinent part:

> The Davidson County Grand Jury indicted [the Defendant] on five counts: two counts of attempted first degree murder (Counts 1 and 2), one count of reckless endangerment (Count 3), and two counts of employing a firearm during the commission of, or attempt to commit, a dangerous felony (Counts 4 and 5). The charges stem from an incident that occurred in July 2016. . . . .

> The reckless endangerment charge was nolled; thus, the firearm charges were renumbered as Counts 3 and 4 on the verdict forms. The trial commenced on November 26, 2018, with testimony lasting three days. Deliberations continued until November 30, 2018. The jury ultimately convicted [the Defendant] of the lesser included offenses of attempted voluntary manslaughter and reckless endangerment for Counts 1 and 2, respectively, and one count of employing a firearm during a dangerous felony. The jury returned no verdict as to the second firearm count.

We agree with the State that the Defendant's conviction for employing a firearm during the commission of a dangerous felony was clearly linked to count one, for which the jury found him guilty of attempted voluntary manslaughter, a dangerous felony under

- 16 -

the statute. We, therefore, conclude that the evidence is sufficient to sustain the Defendant's conviction for employing a firearm during the commission of a dangerous felony.

## B. Attempted Voluntary Manslaughter and Reckless Endangerment

The Defendant contends that the evidence is insufficient to sustain his convictions for attempted voluntary manslaughter and reckless endangerment because the "State failed to prove beyond a reasonable doubt that [he] did not act in self-defense." The State argues that it sufficiently rebutted the Defendant's claim of self-defense, and that the evidence was sufficient to sustain the Defendant's convictions for attempted voluntary manslaughter and reckless endangerment. We agree with the State.

Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a) (2010 & 2018). As charged in this case, "[a] person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" Tenn. Code Ann. § 39-12-101(a)(2) (2011 & 2018). A person commits the offense of reckless endangerment "who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." *Id.* at §39-13-103(a).

At the time of the offense, Tennessee Code Annotated section 39-11-611(b)(2), which governs claims of self-defense, provided as follows:

> (2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
>
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
>
> (C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. §39-11-611(b) (Supp. 2016).

- 17 -

When self-defense is fairly raised by the evidence, the State carries the burden of proof to negate the defense beyond a reasonable doubt. *See* Tenn. Code Ann. §39-11-201(a)(3) (2014); *State v. Benson*, 600 S.W.3d 896, 903 (Tenn. 2020) (citation omitted). However, whether a defendant acted in self-defense is a question of fact for the jury to determine. *See State v. Goode,* 956 S.W.2d 521, 527 (Tenn. Crim. App.1997); *State v. Ivy,* 868 S.W.2d 724, 727 (Tenn. Crim. App.1993).

We conclude that the evidence was more than sufficient for the jury to reject the Defendant's claim of self-defense. Viewed in the light most favorable to the State, the evidence established that the Defendant opened fire on Mr. Bailey's vehicle within seconds of Mr. Bailey's pulling up beside the Defendant. The evidence further established that no one in Mr. Bailey's vehicle had a weapon, that no one exited the vehicle, and that no one said anything to the Defendant, threatening or otherwise, immediately before the Defendant opened fire. Further, by the Defendant's own admission, at the time he fired his weapon he was angry with Mr. Bailey and wanted to hurt him. From all this evidence, a rational jury could reasonably find that the Defendant did not act in self-defense but instead acted in a state of passion produced by adequate provocation that would lead a reasonable person to act in an irrational manner. A rational jury could also reasonably find that the Defendant, in firing multiple gunshots at Mr. Bailey and his vehicle, recklessly engaged in conduct that placed Mr. Rankins in imminent risk of death or serious bodily injury. We, therefore, conclude that the evidence is sufficient to sustain the Defendant's convictions for attempted voluntary manslaughter and reckless endangerment.

## II. Restriction of Cross-Examination of Mr. Bailey

The Defendant next contends that the trial court abused its discretion in restricting his cross-examination of Mr. Bailey about his intent and/or plans to commit a robbery. The Defendant argues that the text messages exchanged between Mr. Bailey and Ms. Fuentes in which Mr. Bailey expressed his desire to obtain money through the violent crime of robbery "went towards [Mr. Bailey's and Ms. Fuentes'] 'intent' and/or 'motive' in their interactions with [the Defendant] that evening[,]" and that its probative value outweighed the danger of unfair prejudice, as "it would have underscored [the Defendant's] thought process that led to his actions in self-defense."

The State argues that the trial court properly restricted the cross-examination of Mr. Bailey because any probative value the evidence might have carried was outweighed by the danger of unfair prejudice. In support, the State points out that there was no evidence that a robbery occurred and no evidence that the Defendant, prior to the shooting, was aware of the text messages. The State additionally notes that, at the time of the court's ruling, no proof of self-defense had yet been introduced.

Tennessee Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Such evidence may, however, be admitted for other purposes if the following conditions are met prior to admission of this type of proof:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid.404(b). "Other purposes" have been defined to include the defendant's motive, intent, guilty knowledge, identity, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation. *See State v. Berry,* 141 S.W.3d 549, 582 (Tenn. 2004). If the trial court substantially complies with the procedural requirements of Rule 404(b), we will review the trial court's determination for an abuse of discretion. *State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005) (citations omitted).

With the enactment of Tennessee Code Annotated section 24-7-125, the protections provided by Tennessee Rule of Evidence 404 (b) have been expanded to all witnesses in a criminal case. *State v. Moon*, 644 S.W.3d 72, 82 (Tenn. 2022) (citing Tennessee Code Annotated section 24-7-125) (footnote omitted). Specifically, the statute, which is almost identical to Rule 404 (b) in other respects, provides that "[i]n a criminal case, evidence of other crimes, wrongs, or acts is not admissible to prove the character of any individual, including a deceased victim, the defendant, a witness, or any other third party, in order to show action in conformity with the character trait." Tenn. Code Ann. § 24-7-125.

The record reflects that defense counsel, without seeking prior authorization from the trial court, asked Mr. Bailey on cross-examination, "Now, around this time frame you were - - you wanted to rob someone, correct?" The State objected, and a lengthy jury-out hearing ensued in which Mr. Bailey testified that he texted Ms. Fuentes that he was going to rob someone and that he needed "to hit a lick[,]" meaning that he had "to come up to get some money[.]" Defense counsel argued that Mr. Bailey's texts about a robbery did not fall under Tennessee Rule of Evidence 404(b) because Mr. Bailey's plans or intentions

were not a crime, wrong, or bad act. The trial court rejected that argument, concluding that Mr. Bailey's texts about either planning or wanting to commit a robbery constituted impermissible character evidence for which there was no valid Rule 404(b) exception.

We find no abuse of discretion in the trial court's ruling on this issue. As the State points out, there was no evidence that a robbery occurred or that the Defendant was aware of the texts between Mr. Bailey and Ms. Fuentes in which Mr. Bailey discussed his intention to commit a robbery. Furthermore, the Defendant was able to present other proof, apart from the robbery texts, to show that the Defendant had a legitimate reason to fear Mr. Bailey. Among other things, evidence was presented of Mr. Bailey's and Ms. Fuentes' extortion scheme, of Mr. Bailey's aggressive confrontation with the Defendant earlier in the afternoon, of Mr. Bailey's having pretended to be armed, of Ms. Fuentes and Mr. Bailey's having told the Defendant that Mr. Bailey was armed, and of Mr. Bailey's threats to shoot the Defendant. We, therefore, conclude that the trial court did not err in restricting cross-examination of Mr. Bailey about the specific texts in which he mentioned robbery.

### III. Admission of Ms. Fuentes' Recorded Interview with Police

Lastly, the Defendant contends that the trial court erred in allowing the State "to introduce Ms. Fuentes' entire pre-trial statement to [Detective Heiman] rather than the portions that the State believed were inconsistent with Mr. Fuentes' testimony." The Defendant argues that admitting the entire interview not only contradicted Rule 613(b) of the Tennessee Rules of Evidence because Ms. Fuentes did not deny having made the prior inconsistent statement, but also that its admission "engendered prejudice to [the Defendant] by allowing the jury to unduly focus on Ms. Fuentes' prior, untruthful statement to [MNPD] rather than her trial testimony." The State responds that the Defendant has waived this issue for failing to make a contemporaneous objection at trial. The State further argues that the Defendant cannot show the existence of plain error in the admission of the statement.

As the State points out, the record reflects that the Defendant failed to object at trial to the admission of the statement. We agree with the State that the Defendant, by failing to raise a contemporaneous objection, has waived consideration of the issue. *See* Tenn. R. App. P. 36(a); *State v. Jordan*, 325 S.W.3d 1, 58 (Tenn. 2010). We further agree with the State that the Defendant cannot show that relief should be granted under plain error.

To be entitled to relief under the doctrine of plain error, a defendant has the burden to establish the presence of the following five factors: (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the issue was not waived for tactical reasons; and (5) consideration of the error is necessary to do substantial justice.

- 20 -

*State v. Vance*, 596 S.W.3d 229, 254 (Tenn. 2020) (citations omitted). "'Moreover, the error must have been of 'sufficient magnitude that it probably changed the outcome of the trial.'" *Id.* (quoting *State v. Banks*, 271 S.W.3d 90, 119 (Tenn. 2008)).

The record reflects that defense counsel not only failed to raise an objection to the State's introduction of the statement at trial, but also strenuously argued at a November 16, 2018, pretrial hearing that the statement should be admitted as the statement of an unavailable witness. Defense counsel stated that she anticipated that Ms. Fuentes would invoke her Fifth Amendment rights if called as a trial witness and argued that the Defendant had the right to introduce Ms. Fuentes' statement detailing the extortion scheme in order for the Defendant to present his defense. Thus, the Defendant cannot show that he did not waive his objection to the introduction of the statement for tactical reasons. Nor can the Defendant show that a clear and unequivocal rule of law was breached, that a substantial right of his was adversely affected, or that consideration of the error is necessary to do substantial justice. We, therefore, conclude that the Defendant is not entitled to relief on the basis of this issue.

## CONCLUSION

Based on our review, we affirm the judgments of the trial court.

_____
JOHN W. CAMPBELL, SR., JUDGE